The Honorable, the judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez. All persons having the amount of form of business before the Honorable, the United States Court of Appeals for the 4th Circuit, I admonish you to draw nigh and give their attention, for the Court is now sitting. Godspeed to the United States and this Honorable Court. Thank you very much. Have a seat. We're pleased to have you all with us today, particularly pleased to be back in Richmond, or at least for the most part. We'll hear the first case, 20-1576. Mr. Rathod, did I pronounce that correctly? It's Rathod, Your Honor. Good afternoon, Your Honors. My name is Jayesh Rathod. I'm counsel for the petitioner, and I'm also a professor and supervising attorney with a clinical program at American University, Washington College of Law. I'm absolutely delighted to introduce to you today, Maya Sukazaki and Jeremy Pado, who are law students in their third year at American University. They will be presenting the argument for the petitioner today, and both have entered their appearance before this court consistent with Local Rule 46A. Well, we certainly appreciate all the work that you do for us and are excited to hear from the students. Ms. Sukazaki, if I got that close, roll with it. We're happy to hear from you. Thank you, Your Honor. May it please the Court, my name is Maya Sukazaki for the petitioner, Mr. Miguel Angel Ibarrachevez. Today, we are asking this Court to grant the petition for review for at least one of three reasons. First, the Board abused its discretion by ignoring essential, legally significant evidence favorable to the petitioner in his application for relief under the Convention Against Torture. Second, because the Board failed to properly apply the aggregation standard from this Court's precedent in Rodriguez-Arias. And third, because the Board failed to apply a de novo standard of review to the petitioner's claim, which is a mixed question of facts and law. Your Honors, if I may first turn to the question of abusive discretion. This circuit has held that the immigration judge may not ignore unrebutted, legally significant evidence, that is from the case Bajaran v. Holder. And in this case, the immigration judge, and subsequently the Board in affirming, ignored legally significant testimony from expert witnesses. The immigration judge specifically ignored final conclusions and opinions of the expert witnesses, despite the fact that they provided lengthy statements, and one witness, Dr. Moody, testified, and the immigration judge at the hearing found her to be credible. Still, the immigration judge ignored and failed to discuss these overall findings and individualized conclusions related to Mr. Ibarrachevez' claim from the expert witnesses. If I may give an example of one statement that was ignored, Dr. Moody, in the concluding paragraph of her affidavit, said, and I quote, I believe there is a very high risk that Mr. Ibarrachevez would be tortured and murdered by gang members if he were forced to return. This is page 514 of the record. And additionally, Dr. Montgomery, in her concluding paragraph, said, and I quote, I strongly believe that the applicant's life is in danger should he be returned to El Salvador. Returning the applicant to El Salvador may well mean the same fate as his brother, the death sentence. That is page 561 of the record. Here, the immigration judge clearly ignored evidence from our expert witnesses related to the evidence from multiple sources of torture, and turned a blind eye to unrebutted, legally significant evidence on the record. At a minimum, we argue the immigration judge should have been required to address the unrebutted conclusions of the experts on the record. Now, opposing counsel may assert that we are asking the immigration judge to mention every line of the evidence in their opinions, which is not the case. As I mentioned in this case, even the conclusions and overall opinions, the reasons that the expert witnesses were brought as evidence, were not addressed by the immigration judge in her analysis. And consistent with this court's case law, at a minimum, this unrebutted and legally significant evidence should have been grappled with in the immigration judge's analysis. Counsel, does it matter to you that the conclusions that you point to are on the ultimate question to be decided by the immigration judge? Does that make a difference? So it might be one thing to ignore factual information or subsidiary positions provided by an expert, but when the expert offers the conclusion on the issue to be decided, does that make a difference to your analysis? Your Honor, that is what we are arguing. At least these unrebutted conclusions should have been addressed. They were related to the individualized risk of torture, as Your Honor mentioned, and the immigration judge did not address them or did not mention why she did or did not find them credible in her analysis of the petitioner's claim. Instead, she cherry-picked specific pieces of evidence related to extradition killings and also spent nearly a paragraph on a single footnote while ignoring these unrebutted, legally significant pieces of evidence. Your Honor, we'd also argue that the immigration judge failed to fully consider some reports that were included as evidence from both our counsel and the DHS, specifically State Department human rights reports, and also reports from Congressional Research Service that provided evidence of the risks that Ms. Ribeiro would face if returned, risks of detention and also risks of extradition killings and the impunity that law enforcement experience. And if I may point to a few other cases on this issue, I, Chen V. Holder from this circuit, held that the Board cannot selectively consider evidence. And then Tassi V. Holder of this court also held that the Board cannot rely on isolated snippets of evidence, as the immigration judge did in our case, we would argue. Can I ask a slightly different question? I'll phrase it as a hypothetical so that we don't get into what you think of the characterization. But if hypothetically an immigration judge casts doubt on the various premises of an expert that undermines the ultimate conclusion, would that be sufficient? So in other words, if I call into doubt point A, B, and C, but as calling those three into doubt, I then don't directly address the conclusion that flows from A, B, and C. Is that sufficient? Or in your view, do they have to separately address the conclusion even if they undermine its foundation? Your Honor, I believe we would still argue that the conclusion or final opinion, at least, of the experts, should still be addressed by the immigration judge. I thought that would be your answer. Why is that? Why would that be the scenario? Your Honor, I believe we can point to the case court overview folder from the circuit that held that the board's review was limited to the actual reasoning that the immigration judge provided. And thus, in order to enable the board to review, the immigration judge should address all unrebutted legally significant evidence, including these conclusions from the expert witness. Well, but they're not evidence, right? I mean, that's a little bit of the problem, right? So it's like point A, B, and C. If I disprove it's not A, not B, not C, then the conclusion is sort of by definition been rebutted. I mean, this is the hypothetical, right? I'm not asking you to concede that that's what we have here. But if I've undermined each of the foundational elements of the conclusion, why would I have to separately address the conclusion given that I've undermined each of its foundational elements, or even just one of its foundational elements? Your Honor, I believe that in an immigration case where there are so many different factors to be considered, so many different potential statistics, other evidence that could be addressed in the final conclusion of these experts. That is why we would argue that the conclusion should still be addressed. I suppose, hypothetically, if the immigration judge did go on at length and rebut every single piece of evidence that was relied on by the expert, then perhaps in that case, the conclusion wouldn't need to be addressed. But that is not what occurred in this case. There were only very specific statistics and notes pulled from the expert statements rather than addressing the entire affidavits. And so we're arguing at a minimum these rebutted conclusions should have been addressed. Your Honors, if I may turn to the issue of aggregation, unless there are further questions related to abuse of discretion. So, Your Honors, we argue that in this case, the immigration judge and the board committed at least one fundamental error in applying this court's precedent of Rodriguez-Arias by conflating two distinct sources of torture, namely the law enforcement and the vigilante death squads. So, Your Honors, Rodriguez-Arias is requiring each source of torture to be considered separately before aggregating the total risk of torture to the petitioner from all sources. But in our case, in the same series of paragraphs, when applying facts to her analysis, the immigration judge relied on evidence specifically related to risk of torture from law enforcement before concluding, and I quote, the likelihood of torture from police and vigilante death squads is significantly below 50 percent. That is page 70 of the record. And so, effectively, the immigration judge and then the board in affirming referred to both these vigilante death squads and law enforcement in a single breath effectively without providing distinguished analyses for each. So, what's the best, I mean, it doesn't have to be from our circuit or elsewhere, but you seem to suggest that the use of the phrase separately there suggests that each risk, the IJ must assign a percentage to each risk and then aggregate them as a mathematical matter, as opposed to just consider both of them. What's the best authority you've got that the immigration judge must assign a specific percentage to each risk, as you say, separately? Your Honor, respectfully, we would not necessarily argue that a specific percentage needs to be assigned to each risk. We do think that our case shows some ambiguity in Rodriguez-Arias. And so, as in our brief, we mentioned we'd recommend something that looks like a hybrid of applying quantitative and qualitative terms to this analysis. And if I may, we would like to recommend three particular points of guidance on how aggregation might be conducted under Rodriguez-Arias. If I may articulate these. First, we are recommending that the agency be required to provide at least sufficiently detailed explanations in order to enable meaningful judicial review. Intuitively, the more complicated the evidence is, the more complete the analysis should be, consistent with this court's ruling in Molina-Mendoza v. Sessions. Second, we'd recommend requiring the agency to provide specific and cogent reasons for each separate risk assessment before aggregating the total risk. And then third, we would recommend that the agency describe the separate and then the aggregate risk of torture in quantitative terms, if possible, with using the record, or at least by using sufficiently specific qualitative descriptors. And these should be related to individualized risk of torture. So, Your Honors, if the record allows and includes quantitative terms, the immigration judge might apply. So, which of those things do you think didn't happen here, or what went wrong based on this record, and what was before this immigration judge and the BIA in this case? Your Honor, we would respectfully argue that all three of these recommendations did fail to occur in our case. There was not a sufficiently detailed explanation of the risk from all three potential sources of torture. There also was not a – there were not specific cogent reasons given for a risk assessment. Just to – I don't want to nitpick, but the IJ broke them out and gave, I found, at least three reasons why the likelihood of torture by gangs was below 50 percent, three separate reasons and explanations. And then, similarly, three different explanations and reasons for why government officials or vigilantes, the evidence didn't support finding that the likelihood of torture by those was more than 50 percent. And then went on to say, and adding them all together, it's still less than 50 percent. So, how much more is required? Your Honor, we would argue first that the conflation of the vigilante death squads and the law enforcement was an error, and there was not a separate analysis of the risk from vigilante death squads. There were not specific and cogent reasons given for any analysis, because there was no analysis from the immigration judge. If the two of them combined is significantly less than 50 percent, why would we think that analyzing them separately would result in anything different? Your Honor, the immigration judge relied on evidence related to law enforcement without providing an analysis of vigilante death squads. So, we would argue that this case should be remanded for the immigration judge to consider and provide an analysis of evidence related to the vigilante death squad, because they are a distinct potential source of torture that Mr. Ybarra would face if returned. And then additionally, we would also argue that these kind of qualitative descriptors given by the immigration judge were not specific enough. By saying that the risk of torture is quote-unquote significantly below 50 percent for the separate sources, but then also in the aggregate, intuitively it does not necessarily make sense for the total risk separately and then the total risk in the aggregate to use the same qualitative descriptor. And so, we would argue for a requirement of more sufficiently specific qualitative descriptors to be used by immigration judges. Your Honors, I see my time is running low. If I may quickly turn to the issue of the mixed question of fact and law. In this case, the Board failed to apply bifurcated review to this mixed question of fact and law. This court has held in Turks and Beholder, and the Board has also held in matter of RAF, that the definition of torture is a legal question. So, torture has a definition in the regulations, and determining whether certain facts rise to that definition of torture is a legal question. So, for example, whether someone would be subject to imprisonment or beating in the future, that is a factual question. But whether that conduct rises to the level of torture is a legal determination that makes this a mixed question of fact and law. That in our case was not properly applied, and the legal question was not reviewed de novo by the Board. Your Honors, I see... Counsel, before you sit down, I'd like to ask Judge Traxler if he has any questions for you in particular. No, thank you. No questions, Judge Richardson. Thank you. Your Honors, I see my time has ended. May I briefly conclude? You may. Thank you, Your Honor. We urge this court to grant the petition for review and remand so that the immigration judge can correctly consider all legally significant evidence and properly aggregate the risk of torture to our client from all three possible sources. Thank you, Your Honors. Thank you, Counsel. Ms. Boggy, if I'm getting that close? Boggy, good afternoon, Your Honor. Boggy, thank you, Counsel. I'm happy to hear from you. Good afternoon. May it please the Court, I'm Sharza Boggy, representing Respondent United States Attorney General. This is a case in which the petitioner has failed to establish a particularized risk of torture, and the record evidence in this case does not compel a reversal of the agency's finding. We therefore request that the petition be denied. In assessing the likelihood of torture in this case, the agency considered all sources of potential harm to the petitioner, both separately and in the aggregate, including harm from gangs, police, and vigilante groups. And in doing so, the agency considered all relevant evidence. The agency directly addressed the petitioner's claim that he would be targeted because of his past experiences in El Salvador, as well as his tattoos and police cooperation here in the United States. And I would like to go through the agency's analysis. First, with respect to gangs, the agency found it significant that the petitioner has not received direct or indirect threats since 2011 from gangs. Additionally, after his brother's 2011 death, he was able to continue living in El Salvador for about a year and a half, and he was not significantly harmed during this time. The absence of any threats since 2011, or any indication of interest in him, undermines his claim that he would be at risk of torture in El Salvador because of having witnessed his brother's death or refusing to join a gang. In addition, with respect to his claim that he would be targeted because of his police cooperation in the United States, there is no indication that the gang in El Salvador is aware of his cooperation or would become aware. This claim is based on speculation. Additionally, there is record evidence showing that he has affiliated with MS-13 here in the United States following his 2014 police cooperation. And if that is in fact the case, there is no indication he has been threatened by the gang here. His own witness, Dr. Montgomery, stated that if the gang in the United States was aware of his cooperation, that would have been communicated to the gang in El Salvador, and he would have been threatened at this stage. With respect to the police and vigilante death squads, the immigration judge in this case recognized that suspected gang members and gang members are at a higher risk of torture. However, despite this generalized evidence in the record, there's no other indication, there's no evidence that he would be at a particularized risk of torture, whether by police or vigilante squads. He would have to present more than the country conditions evidence, which both the IJ and the board noted in their decisions. Counsel, can you respond to your colleague's suggestion that it is error to have grouped those two together, police and vigilante groups, that for some reason that those need to be discussed in a separate paragraph or in a separate way? Why do you think that's not right? Well, for two reasons. First of all, in this record, well, the fact that the immigration judge did consider all sources of harm in the aggregate and concluded together, whether separate or together, they would not rise to the level of clear probability. It would not have made a significant difference if it was analyzed completely separately. And also, there's no indication in the record that these are completely separate entities, as we noted in our brief. The immigration judge, well, Dr. Moody stated in her affidavit that there was some overlap. There's indication that the police are involved in the vigilante squads. And additionally, this is consistent with State Department reports and petitioner has not shown these are separate entities. But ultimately, the fact that the immigration judge took a cumulative approach resolves this issue in concluding that they did not establish a clear probability when considered together. So I understand that. It seems like you're saying two points. One, you can consider groups together as long as you're explaining what you're doing. But separately here, although maybe not necessary, the fact that those two groups were related to some degree sort of further justified doing so. Correct, Your Honor. Yes. And I would also like to address petitioner's claim that he would be identified as a possible suspected gang member upon removal. He claims that his criminal history will be disclosed upon removal and that he would be targeted under Decree 717, be detained and tortured. And to that extent, there's no indication that he would be flagged by the Department of Homeland Security as a suspected gang member. As we noted in our brief, the Department of Homeland Security would indicate gang affiliation if that's the reason someone is being removed. And while there is some evidence of gang affiliation here, his criminal conviction documents don't identify him as a suspected gang member. Even assuming that were the case, even if he is identified as so or suspected as being a gang member, he would still have to show a clear probability that he would be detained under Decree 717 and then tortured. So this is a chain of events that he would have to prove. And he has not done so here. And finally, with respect to his claim that he would be targeted because of his tattoos that he obtained in the United States, the agency noted that as an initial matter, these are not gang-related tattoos. And while he claims that they would be viewed as such, he would still have to show more than a general assertion that he would be tortured just because of that. His evidence rather shows that he could be discriminated against or harassed. There's nothing other than that that would show that he specifically would be targeted for torture because of his tattoos. And just to address the claim that evidence was not considered here, as an initial matter, we would argue that the presumption has not been rebutted here, that all evidence was considered by the agency. And as we noted in our brief, a reading of the agency decisions indicates that the immigration judge and the board took into account all relevant evidence. The immigration judge stated that she had evaluated everything. She cited several paragraphs of the expert testimony. She also outlined arguments in support of Petitioner's claim. The board as well cited two exhibits provided by both the DHS and Petitioner in this case. Ultimately, the immigration judge was not persuaded that the evidence established a clear probability of a particularized risk of torture in this case. And we would argue that there's no indication that there's any legally significant evidence that was overlooked in the agency's analysis of Petitioner's claim. And with respect to the aggregation argument here, we maintain that the agency's decision is consistent with this court's holding in Rodriguez-Arias. The immigration judge's opinion reflects that she identified every single source of torture, considered it separate and as I mentioned, and ultimately concluded that they did not rise to the level of clear probability. And I would finally like to address the argument that Petitioner raises with respect to the board's review. As we noted in our brief, the Petitioner did not exhaust the specific claim that the aggregation analysis requires another level of review. As this court has held in Turkson, the factual predictions with respect to CAT, with respect to clear probability require a clear error review. And this is exactly what the board did here. And just in conclusion, the agency decision reflected consideration of all aspects of its claim. And we would request that the petition in this case be denied. Judge Traxler, do you have anything? No, thank you, Judge Richardson. Thank you, counsel. I appreciate your argument. We'll hear the reply from Mr. Padau. Am I close? Padau, yeah. Padau. I'm 0 for 3 today. I apologize. Good afternoon, Your Honors, and may it please the court. My name is Jeremy Padau for the Petitioner, Miguel Ibarra-Chavez. In the interest of time, I'd like to address a few of the government's positions, starting with the issue of abuse of discretion. We believe that there was an abuse of discretion in Mr. Ibarra's case because, according to the case of Tassie V. Holder, it is an abuse of discretion when a court distorts or disregards aspects of an applicant's claim. And in this case, given the vast disparity between the expert report's individualized conclusions about Mr. Ibarra's risk of torture and the immigration judge's final analysis, those two things, the vast disparity between those two results shows that there is a distortion in the evidence in Mr. Ibarra's claim. And as to the evidence of the lack of threats that Mr. Ibarra received— Is that—I want to make sure I understand that argument. So anytime there's a significant disagreement between the IJ and the experts, then there is a distortion? I mean, that seems like a circular argument, right? Your Honor, respectfully, in this case, given the experts' language that Mr. Ibarra is at grave danger of being tortured on page 533 of the record or at a very high risk of torture on page 346, it's not clear that the IJ fully engaged with the individualized conclusions in the record and only focused on one footnote in one expert's report and in isolated facts in another expert report. So when such a distortion exists like this that varies so far from what the individualized conclusions were, it appears that there was a distortion. But I actually wanted to move on to the issue of the lack of threats that Mr. Ibarra received. Mr. Ibarra was threatened several times in El Salvador, which caused him to go into hiding. And given this court's precedent in Ortiz-Cruz v. Barr, time spent in hiding does not negate the potential of future harm. And the government also raised the issue that it's not clear that news of Mr. Ibarra's cooperation with police has traveled to the gangs in El Salvador. Well, our expert, Dr. Moody, on page 505 of the record also provides evidence that when a new deportee or a newcomer enters a community in El Salvador, members of gangs investigate that person. And gangs function as the effect of government in many of these areas, including the region of Soya Pongo, the region where Mr. Ibarra comes from. So it seems likely that his ties to police will be investigated and discovered. And I also wanted to address other issues. Can I ask that question? So just taking that premise, right, so you say it seems likely that they would learn that he cooperated. And this is the sort of probabilities question, I think. I want to make sure I understand your position. If that was the theory, let's imagine that's the only theory, and I know that's not your argument. Wouldn't we have to aggregate that risk with whatever the risk is or the probability that if they learned he cooperated that he would be tortured as a result of it so that it requires both of those things to be true in sort of basic probability math? Your Honor, respectfully, I believe that the factor that gangs may, the probability of the gangs in El Salvador learning of his cooperation with police might not have to be its own variable in an aggregation analysis. But it could just simply make the likelihood of being tortured by the gangs more true or make that percentage higher. But if we'd imagine that there's a 50 percent chance that their investigation turns up his cooperation and there's a 50 percent chance that if they learn he cooperates that they torture him, we wouldn't obviously say there's a 50 percent chance of his torture, right? We would instead say that there's a, I believe, 25 percent chance of his torture, if my math is right. Right, Your Honor. from vigilante death squads or others would also inform other variables in the aggregation analysis.  Obviously, we very much appreciate your participation. In particular, obviously, American University and your immigration clinic, you all provide an invaluable service to our court, and we can't thank you enough, both professor and students, for the time, effort, and energy you put into preparing and presenting this case.
judges: Julius N. Richardson, Allison J. Rushing, William B. Traxler Jr.